OREN GLEICH (NY Bar No. 4460135) *pro hac vice pending*
Email: GleichOr@sec.gov
DOUGLAS M. MILLER (Cal. Bar. No. 240398) (Local Counsel)
Email: MillerDou@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
Email: GleichOr@sec.gov
Telephone: (212) 336-0190 / Fax: (212) 336-1319

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>               Plaintiff,<br><br>       vs.<br><br>HISTORIC ASSET PLACEMENT SERVICES GLOBAL, LLC, CHRISTOPHER W. ABSHIER, BILLY W. ABSHIER, FREDERIC A. GLADLE, RONALD JOSH PENDLEY, KEVIN E. SCANNELL, SOVEREIGN DEBT SOLUTIONS, LP, AND OCEAN PARK PARTNERS,<br><br>               Defendants, and<br><br>BARBARA GLADLE,<br><br>               Relief Defendant. | Case No. 2:24-cv-10745<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT

Plaintiff, the Securities and Exchange Commission ("SEC"), alleges as follows:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a)] and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a)].

2.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this Court pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa] because acts, practices and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Central District of California, including the solicitation of investors, many of whom reside in this District.

4.     In addition, venue is proper in this district because Defendants Ronald Josh Pendley ("Pendley") and Kevin E. Scannell ("Scannell") reside in this district and Defendants Sovereign Debt Solutions, LP ("Sovereign Debt Solutions" or "SDS") and Ocean Park Partners ("OPP") have their principal places of business in this District.

## SUMMARY

5.     This civil enforcement action concerns the fraudulent offer and sale of defaulted and unredeemed bonds issued by the German Weimar Republic and certain German utilities and by the governments of pre-revolutionary Russia and China (the "Historical Bonds").  This action also involves the fraudulent and unregistered offer

and sale of promissory notes and limited partnership interests, the value of which was tied to such Historical Bonds. As part of the fraudulent scheme, the Defendants promoted a fictitious redemption process for Historical Bonds which falsely claimed that investors would receive proceeds of up to $15 million for their bonds with an advance payment of $250,000. In reality, this purported redemption process was a sham, no advance payment of $250,000 was ever made, and no Historical Bonds were ever redeemed. In all, the fraud raised at least $3.85 million from at least 85 investors between January 2017 and August 2023 (the "Relevant Period"). The fraudulent scheme worked in three parts.

6. **First**, the Defendants Historical Asset Placement Services Global, LLC ("HAPS"), its managing member Christopher W. Abshier ("C.W. Abshier"), and C.W. Abshier's father and the day-to-day operations manager of HAPS, Billy W. Abshier ("Billy Abshier" or, together with C.W. Abshier, the "Abshiers") (collectively the "HAPS Defendants") offered custodial services in which HAPS would hold and safeguard its customers' Historical Bonds. They also offered purported redemption services through which HAPS would monetize the Historical Bonds.

7. In connection with these services, the HAPS Defendants offered commissions to affiliates to solicit customers to use HAPS' services. The HAPS Defendants claimed that these commissions would be paid from the proceeds of the Historical Bonds once they were monetized.

8. The HAPS Defendants told their affiliates and clients materially false information about their fictitious redemption process. These materially false statements included that the redemption process involved the participation of the U.S. and foreign governments, and well-known financial institutions and accounting firms. The HAPS Defendants claimed further that the redemption process would result in a "global currency reset" that various national governments were negotiating which would result in most, if not all, countries using currencies backed by assets such as

Historical Bonds.  The HAPS Defendants also promised investors a $250,000 advance on the redemption value of each investor's Historical Bonds.  These representations were completely false, and no such redemption process existed. Investors never received any advances on the supposed redemption value of their Historical Bonds, and none were ever redeemed.

9.    The HAPS Defendants knew, or were reckless in not knowing, that those soliciting HAPS clients repeated the HAPS Defendants' false representations regarding the purported redemption process for the Historical Bonds in their custody.

10.    **Second**, Defendants Frederic A. Gladle ("Fred Gladle") and Relief Defendant Barbara Gladle (collectively, the "Gladles"), and Defendants Pendley and Scannell each acquired Historical Bonds, which they placed in the custody of HAPS prior to resale to third parties.  During the Relevant Period, the Gladles purchased and sold Historical Bonds to Pendley and at least one retail customer; Pendley resold the bonds he purchased from the Gladles and others to retail customers.  Fred Gladle aided and abetted some of these sales.  Scannell likewise sold Historical Bonds to retail customers.

11.    In effecting or, in the case of Fred Gladle, aiding and abetting the resales of Historical Bonds, Fred Gladle, Pendley, and Scannell referenced HAPS' custodianship of the bonds and repeated the HAPS Defendants' false claims about the redemption process to investors.  In some cases, they embellished the HAPS Defendants' falsehoods with their own falsehoods.

12.    Fred Gladle, Pendley, and Scannell knew of the existing governments' longstanding refusal to payout on the bonds and the adverse decisions in court actions to recover on the bonds.

13.    Fred Gladle, Pendley, and Scannell each knew, or was reckless or negligent in not knowing, that their statements to investors were materially false or omitted material information which made the statements materially misleading.

14.    **Third**, Pendley and Scannell, through Sovereign Debt Solutions, and its

COMPLAINT                                    4

general partner, Ocean Park Partners, of which Pendley and Scannell were officers, perpetrated a related scheme involving the unregistered and fraudulent offer and sale of promissory notes and limited partnership interests issued thereunder, the value of which was tied to certain Historical Bonds.  Through OPP, they directed SDS to solicit existing SDS limited partners to enter into the promissory notes with SDS.

15.     These notes purported to provide investors with 10% interest on the principal as well as limited partnership interests in Sovereign Debt Solutions. Payment on these notes and the value of the limited partnership interests depended entirely on the redemption of Historical Bonds owned by SDS, and for which HAPS provided custodial and purported redemption services.

16.     Prior to their soliciting Sovereign Debt Solutions' limited partners to purchase the promissory notes, Pendley and Scannell had plied the limited partners for years with the same HAPS Defendants' lies about the HAPS redemption process, which Pendley and Scannell further embellished with their own falsehoods.

17.     The promissory notes and Sovereign Debt Solutions' limited partnership interests were securities.  No registration statement was filed with the Commission with respect to their offer and/or sale and no exemption from registration applies.

18.     Pendley and Scannell each knew, or was reckless or negligent in not knowing, that the statements regarding the HAPS redemption process that they made to the Sovereign Debt Solutions limited partners to induce them to purchase the promissory notes were materially false or omitted material information which made the statements materially misleading.

19.     Together, the Defendants' schemes raised at least $3.85 million from at least 85 investors located in several states, including California, Florida, Michigan, Texas, and Virginia, all of whom lost the entirety of their investments.  Of those proceeds raised, at least $1.74 million were routed to the bank account of Relief Defendant Barbara Gladle, who had no legitimate claim and gave no consideration in exchange for these proceeds.

20. By engaging in the conduct alleged in this Complaint:

   a. Defendants violated and, unless restrained and enjoined, will violate again, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

   b. Fred Gladle, Pendley, Scannell, Sovereign Debt Solutions, and Ocean Park Partners violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)];

   c. Pendley, Scannell, Sovereign Debt Solutions, and Ocean Park Partners violated Securities Act Sections 5(a) and (c) [15 U.S.C. §§77e(a) and (c)];

   d. Fred Gladle aided and abetted Pendley's violations of Securities Act Section 17(a);

   e. Fred Gladle and Pendley violated Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)(1)] by acting as unregistered dealers; and

   f. C.W. Abshier and HAPS violated Rule 21F-17(a) under the Exchange Act [17 C.F.R. § 240.21F-17(a)].

21. The Commission seeks entry of a final judgment:

   a. imposing permanent injunctions against each of the Defendants for their respective violations of the federal securities laws;

   b. ordering Fred Gladle, Pendley, Scannell, C.W. Abshier, and Billy Abshier to each pay civil monetary penalties;

   c. permanently enjoining Fred Gladle, Pendley, Scannell, C.W. Abshier, and Billy Abshier from directly or indirectly, including, but not limited to, through any entity owned or controlled by each, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent each from purchasing or selling securities listed on a national securities exchange for their own personal account;

d.  ordering Fred Gladle and Barbara Gladle, on a joint and several basis, Pendley, and Scannell to pay disgorgement and prejudgment interest; and

e.  prohibiting Pendley, Scannell, Fred Gladle, and C.W. Abshier from serving as an officer or director of a public company.

## TOLLING AGREEMENTS

22.    HAPS and the SEC entered into tolling agreements suspending the running of any applicable statute of limitations from March 28, 2024 through September 28, 2024, and from September 29, 2024 through November 29, 2024.

23.    C.W. Abshier and the SEC entered into tolling agreements suspending the running of any applicable statute of limitations from March 28, 2024 through September 28, 2024, and from September 29, 2024 through November 29, 2024.

24.    Billy Abshier and the SEC entered into a tolling agreement suspending the running of any applicable statute of limitations from September 30, 2024 through November 29, 2024.

25.    Fred Gladle and the SEC entered into a tolling agreement and two tolling agreement extensions suspending the running of any applicable statute of limitations from February 6, 2024 through November 29, 2024.

26.    Pendley and the SEC entered into tolling agreements suspending the running of any applicable statutes of limitations from January 31, 2024 through July 31, 2024, and from August 1, 2024 through October 7, 2024.

27.    Scannell and the SEC entered into tolling agreements suspending the running of any applicable statute of limitations from January 31, 2024 through July 31, 2024, and from August 1, 2024 through October 7, 2024.

28.    Barbara Gladle and the SEC entered into a tolling agreement and two tolling agreement extensions suspending the running of any applicable statute of limitations from February 6, 2024 through November 29, 2024.

## **DEFENDANTS**

29.     **HAPS** is a Nevada LLC initially formed in September 2010 and reformed in Wyoming in December 2021.  During the Relevant Period up to the present, its principal place of business has been Temple, Texas.

30.     **C.W. Abshier**, age 45, resides in Troy, Texas.  He served as the managing member of HAPS during the Relevant Period up to at least early 2024.

31.     **Billy Abshier**, age 68, resides in Temple, Texas and is C.W Abshier's father.  He served as HAPS' day-to-day operations manager during the Relevant Period.

32.     **Fred Gladle**, age 65, resides in Lakeway, Texas.  During the Relevant Period through the present, he has been married to Barbara Gladle.  During the Relevant Period, he was not registered with the Commission in any capacity.  He previously held Series 7, 22, 24, and 63 licenses and was associated with a series of registered broker-dealers from November 1985 through 1997.

33.     In 2004, a federal district court entered a consent judgment against Fred Gladle permanently enjoining him from violating the antifraud, unregistered securities offering and broker-dealer registration provisions of the federal securities laws and ordering him to pay $100,000 in disgorgement and prejudgment interest and civil penalties of $57,000, stemming from his allegedly having engaged in fraudulent and unregistered sales of securities while acting as an unregistered broker-dealer.  *See SEC v. Internet Telecommunications Albany System SMR, et al*., 1:99-cv-539 (CKK) (D.D.C. March 2, 1999).  Fred Gladle has not paid the monetary relief to date.

34.     Based on this permanent injunction, the Commission instituted a settled administrative proceeding barring Fred Gladle from associating with a broker or dealer with a right to reapply for association after five years.  *See In the Matter of Frederic A. Gladle*, Admin Proc. File No. 3-11546 (July 14, 2004).

35.     **Pendley**, age 59, resides in Burbank, California.  He co-founded Sovereign Debt Solutions and Ocean Park Partners and has served as OPP's secretary

during the Relevant Period up to the present.  During the Relevant Period, he was not registered with the Commission in any capacity.  He previously held Series 7 and 63 licenses and was associated with a series of registered broker-dealers from October 1989 through December 1998.

36.    **Scannell**, age 59, resides in Santa Monica, California.  He co-founded Sovereign Debt Solutions and Ocean Park Partners and has served as OPP's president during the Relevant Period up to the present.  During the Relevant Period, he was not registered with the Commission in any capacity.  He previously held Series 7, 24, 63, and 65 licenses and was associated with a series of registered broker-dealers from July 1987 through December 2000.

37.    **Sovereign Debt Solutions** is a Nevada limited partnership organized by Pendley and Scannell in Nevada in April 2008.  During the Relevant Period up to the present, it has maintained its principal place of business in Los Angeles, California.

38.    **Ocean Park Partners** is a private company incorporated by Pendley and Scannell in Nevada in September 2007.  It is the general partner of SDS.  During the Relevant Period up to the present, it has maintained its principal place of business in Los Angeles, California.

**RELIEF DEFENDANT**

39.    **Barbara Gladle**, age 64, resides in Lakeway, Texas.  During the Relevant Period through the present, she was married to Fred Gladle.  During the Relevant Period, she was not registered with the Commission in any capacity.

**FACTS**

I.    **The Historical Bond Scheme**

    A.    **The Historical Bonds**

40.    The Historical Bonds at issue are predominantly dollar-denominated bearer bonds issued in the 1920s by the German Weimar Republic and certain German utilities.  Since the 1950s, the German government has generally disavowed responsibility for these bonds.

41.   The Historical Bonds sold to investors also include "Super Petchili" bonds, which the Chinese government issued in the 1910s, and various railroad bonds the Russian government issued at the end of the 19th century and in the first years of the 20th century.  After the 1949 Communist takeover in China and the 1917 Russian Revolution, the governments of those countries consistently refused to recognize the debt.

42.   The Historical Bonds in this matter were offered and sold as securities.

**B.   HAPS' Structure and Efforts to Find Clients**

43.   HAPS was formed in 2010.

44.   During the Relevant Period, C.W. Abshier served as HAPS' sole managing member and Billy Abshier—C.W. Abshier's father—managed HAPS' daily operations.

45.   HAPS offered its customers a custodial service in which it would hold and safeguard its customers' Historical Bonds.

46.   HAPS also promoted a purported redemption service in which it would monetize the Historical Bonds.

47.   To entice clients to use their services, the HAPS Defendants made materially false representations that HAPS' clients would receive a $250,000 cash advance before the purported full value of the Historical Bonds was monetized.

48.   HAPS created a name for this purported advance payment, describing it as "Healing Funds."

49.   To get more customers, HAPS represented that it would pay commissions to individuals responsible for recruiting clients.

50.   HAPS represented that it would fund these commissions by retaining 5% of the redemption proceeds of the Historical Bonds.

51.   HAPS and the Abshiers knew, or were reckless in not knowing, that those individuals who solicited customers for HAPS ("HAPS affiliates"), including Fred Gladle, Pendley, and Scannell, also sold Historical Bonds.

52.    HAPS and the Abshiers knew, or were reckless in not knowing, that the HAPS affiliates induced prospective customers to buy Historical Bonds and to apply to become HAPS members by promoting the HAPS redemption services, including the $250,000 in "Healing Funds."

53.    During the Relevant Period, HAPS generally required each prospective client to complete a "New Member Application," provide supporting paperwork, and enter into a "Non-Circumvention and Non-Disclosure Agreement" ("NCNDA").

54.    The New Member Application and NCNDA expressly referenced the purported redemption process.

55.    The NCNDA required the prospective client to agree not to communicate anything about the redemption process to third parties.

56.    These forms were available for HAPS Affiliates to distribute to prospective HAPS customers.

57.    For example, when Pendley sold Historical Bonds and recruited investor customers for HAPS, he provided these customers with the New Member Application and NCNDA.  These investors then submitted the forms to HAPS, with many noting in the New Member Application that Pendley had referred them to HAPS.

58.    HAPS maintained an internal database for tracking changes in ownership of bonds in its custody.

59.    The HAPS Defendants were put on notice of changes in ownership of Historical Bonds that were held in their custody through the receipt of New Member Applications and related paperwork.

60.    Through New Member Applications and related paperwork, the HAPS Defendants knew, or were reckless in not knowing, that Fred Gladle, Pendley, and Scannell sold Historical Bonds while also recruiting HAPS clients.

61.    In addition to the New Member Applications and associated communications, Fred Gladle corresponded with the HAPS Defendants in October 2022 about Pendley and his interest in selling a sizeable block of Historical Bonds in

HAPS' custody to a third party and inquired if HAPS was willing to take on the buyer as a new client.

62.    Accordingly, through the New Member Application forms and the associated communications, as well as the correspondence with Fred Gladle, the HAPS Defendants knew, or were reckless in not knowing, that when Fred Gladle, Pendley, and Scannell sold Historical Bonds to new investors, they conveyed the HAPS Defendants' material misrepresentations regarding the purported redemption process.

### C.    The HAPS Defendants' Misrepresentations to Investors

63.    The Abshiers communicated with HAPS affiliates about the redemption process in a number of ways.

64.    Throughout the Relevant Period, C.W. Abshier communicated with HAPS affiliates and certain HAPS clients via a HAPS-maintained electronic portal (the "Portal") to which HAPS granted access selectively.

65.    C.W. Abshier would either draft and post himself, or direct Billy Abshier to draft and post based on notes C.W. Abshier provided to him.

66.    C.W. Abshier controlled the substance of all communications posted to the Portal.

67.    During the Relevant Period, Billy Abshier also communicated with investors about the redemption process during in-person meetings and via telephone.

68.    In July 2017, C.W. Abshier posted communications to the Portal that broadly outlined the entire purported HAPS redemption process.  In these communications, C.W. Abshier disseminated, among other things, the following false statements to investors concerning the Historical Bonds:

      a.  once HAPS takes custody of a client's bonds, it transports them by a United States government diplomatic jet to a bank in Hong Kong;

      b.  the bonds are reviewed and authenticated in Hong Kong;

      c.  once the bonds are authenticated, a "Redemption Platform" housed

within a second Hong Kong bank would route funds into a "paymaster account" for the benefit of HAPS' clients;

d.  HAPS' redemption efforts would culminate in a "global currency reset" that various national governments were purportedly negotiating; and

e.  this reset would move most, if not all, countries from using fiat-based currencies to currencies backed by assets such as gold and Historical Bonds.

69.  Throughout the Relevant Period, with slight variations, the Abshiers disseminated to their affiliates and clients the same false information about the purported redemption process as was in the July 2017 postings to the Portal.

70.  For example, on or about March 3, 2022, during an in-person meeting in Temple, Texas, Billy Abshier told Pendley, among other things, the following false information: (a) that the U.S. military transports bonds from HAPS to Hong Kong; and (b) the Redemption Platform had generated enough funds to pay off "the debt of the world."

71.  During the Relevant Period, Billy Abshier also told Pendley that the U.S. Department of the Treasury was involved in the redemption process, but that Billy Abshier could not elaborate further as HAPS was subject to a non-disclosure agreement with the Treasury Department.

72.  As described more fully below, Pendley, who was formerly a licensed and trained securities professional, used the HAPS misstatements to sell Historical Bonds to unsuspecting investors.  Pendley knew, or was reckless or negligent in not knowing, that these HAPS misstatements were materially false.

73.  As noted, the Abshiers also falsely claimed throughout the Relevant Period that each HAPS client would receive an advance on the ultimate final redemption value of their bonds in the amount of $250,000, which they termed Healing Funds.

74.    Both immediately prior to and throughout the Relevant Period, C.W. Abshier gave repeated false assurances to HAPS affiliates and clients that the disbursal of these "Healing Funds" to HAPS clients was imminent, examples of which include the following:

a.    On November 4, 2016, C.W. Abshier posted this message on the Portal: "We were advised that we can expect to see the release and authorization to disburse [Healing Funds] not long after the [2016 U.S. presidential] election takes place."

b.    On January 6, 2017, C.W. Abshier posted this message on the Portal: "Some of the disinformation currently being propagated is that this [redemption of Historical Bonds] could be pushed off to this summer, and even a couple of people have been told that we won't see anything before 2018 at the earliest.  THAT, folks, is NOT what we are being told! … [T]he process has moved way too far forward to be halted now.  We have passed the point-of-no-return in this process."

c.    On October 23, 2020, C.W. Abshier posted this message on the Portal: "Our representative is currently in HK [Hong Kong], he was told to travel in order to receive the funds, and we are told he will come back with the Healing Funds in the paymaster account in the next few days."

d.    On December 30, 2022, C.W. Abshier posted this message on the Portal: "We continue to receive good news and can share that great progress was made throughout the holidays toward approval for release of Healing Funds."

75.    During an in-person meeting at HAPS' office in Temple, Texas on or around March 3, 2022, Billy Abshier falsely represented to Pendley that the Healing Funds had actually arrived.  Billy Abshier declined to show Pendley any documentation or account statements to verify that statement.

76.    In a December 2021 email to Scannell, C.W. or Billy Abshier falsely stated that the Healing Funds "are here and are mine" but could not yet be disbursed. This was false.

77.    Like Pendley, Scannell was also a formerly licensed and trained securities professional who used the HAPS misstatements to sell Historical Bonds to unsuspecting investors.  Scannell knew, or was reckless or negligent in not knowing, that these HAPS misstatements were materially false.

78.    By early 2023, C.W. Abshier generally stopped promising the imminent arrival of the Healing Funds via the Portal, asking HAPS clients to join him in trusting "God's timing and delivery" and stating that he cannot give any further updates on the bonds because he is under a "gag order" of an unspecified source.

79.    Contrary to the HAPS Defendants' representations, the above-described HAPS redemption process did not exist, and the so-called "Healing Funds" were never distributed.

80.    Beyond requiring throughout the Relevant Period that a prospective client enter into an NCNDA stating that the client will not share information about HAPS, C.W. Abshier and HAPS sought to curtail and control clients' access to and sharing of information in other ways.

81.    For example, throughout the Relevant Period, HAPS periodically warned its clients that their accounts would be suspended if they attempted to copy the updates posted to the Portal.

82.    Further, periodic updates that C.W. Abshier posted or had posted to the Portal were initially archived on the Portal and accessible to those to whom HAPS granted Portal access.  In or around 2020, however, C.W. Abshier directed the removal of the archived updates and that each new update be deleted and made inaccessible to a client after he or she reviewed it.

83.    Beginning in March 2023, C.W. Abshier directed HAPS to take the added step of demanding that certain existing and new clients, who wanted access to

the Portal, sign an affidavit affirming that they had "not lodged any complaints nor grievances with the SEC, FBI, or any other regulatory and/or law enforcement agency" and promising to "not file, nor participate in any legal action against HAPS Global… and its affiliates, members, managers, officers, directors, employees, agents, attorneys, staff, volunteers, representatives, predecessors and successors."

84.    At least 22 investors, of which 18 had purchased Historical Bonds from Pendley, executed the affidavit and submitted them to HAPS.

85.    By demanding that clients sign this affidavit, C.W. Abshier and HAPS, took action to impede the HAPS' clients from communicating directly with the SEC about possible federal securities law violations.

86.    The HAPS Defendants continued to periodically post materially false and misleading updates to the Portal throughout the Relevant Period in an effort to lull investors.

87.    The HAPS Defendants knew, or were reckless in not knowing, that each employed a device, scheme, or artifice to defraud; made untrue statements of a material fact or omitted to state material facts necessary to make those statements that were made not misleading; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit on investors in connection with the sale of a security.

88.    C.W. Abshier's scienter is imputed to HAPS as its managing member.

**D.    Fred Gladle Sold Historical Bonds In Furtherance of the Scheme**

89.    The Gladles' principal business activity and primary source of income during the Relevant Period came from buying and selling Historical Bonds.

90.    Fred Gladle and Barbara Gladle each listed his or her occupation as "Historic Document Reseller" in their joint federal tax returns for calendar years 2020 and 2021.

91.    Fred Gladle has been buying and selling Historical Bonds for at least 20 years despite knowing of the existing governments' longstanding refusal to payout on

the Historical Bonds and adverse decisions in court actions to recover on the Historical Bonds.

92.    During the Relevant Period, the Gladles sold Historical Bonds from their inventory, which they maintained with HAPS, to among others, Pendley.

93.    During the Relevant Period, Pendley paid at least $837,000 to a bank account in Barbara Gladle's name.

94.    Fred Gladle knew throughout the Relevant Period that Pendley purchased Historical Bonds from the Gladles for purposes of resale to retail investors.

95.    At Pendley's request, Fred Gladle prepared purchase agreements for Pendley's use in selling Historical Bonds to investors, using a template purportedly obtained from Pendley.

96.    For example, Fred Gladle prepared purchase agreements that Pendley used to sell at least 30 Historical Bonds to at least two investors for at least $190,000 in 2019 and 2020.

97.    The purchase agreements prepared by Fred Gladle to sell 30 Historical Bonds falsely stated that the bonds had been "authenticated" and had "legal claim values that are hundreds of times more than the purchase price being paid." These false claims were made without disclosing the existing governments' longstanding refusal to payout on the bonds and the adverse decisions in court actions to recover on the bonds.

98.    During the Relevant Period, Fred Gladle also emailed HAPS on behalf of at least three of Pendley's clients to ask HAPS to grant them access to the Portal, facilitating the clients' direct access to HAPS' lulling statements.

99.    From March 2019 through May 2019, the Gladles also effected a series of bond sales totaling $910,000 to an investor ("Investor A") from their inventory using similarly-worded purchase agreements.

100.    Initially structured as a direct sale from the Gladles to Investor A, in relation to which Fred Gladle prepared a purchase agreement signed by Barbara

Gladle but never fully executed, the transaction was ultimately restructured to have the Gladles engage in a series of sales to a middleman, who was Pendley's associate, ("Associate A"), who then sold the bonds to Investor A.

101.    Fred Gladle prepared at least one agreement for Barbara Gladle's signature memorializing the sale of bonds from the Gladles' inventory to Associate A, which Barbara signed and emailed to Pendley and Associate A for the latter's execution.

102.    Fred Gladle also prepared at least two agreements relating to Associate A's resale of the bonds to Investor A, with Barbara Gladle and Fred Gladle each emailing one of the two agreements to Pendley and/or Associate A.

103.    All of these agreements Fred Gladle prepared falsely represented that the bonds, for which HAPS served as custodian, had "legal claim values that are hundreds of times more than the purchase price being paid," without disclosing the existing governments' longstanding refusal to payout on the bonds and the adverse decisions in court actions to recover on the bonds.

104.    Associate A wired the $910,000 total purchase price that he received from Investor A to a bank account in Barbara Gladle's name, from which the Gladles paid "commissions" to Pendley and Associate A in the amounts of $315,135 and $268,369, respectively, retaining $326,496.

105.    At the time of the foregoing sales, the Gladles resided in Texas and Pendley, the Associate A, and Investor A resided in California.

106.    The Gladles never sought to verify the HAPS redemption process or whether any bond had a legal claim value hundreds of times more than the purchase price paid.

107.    As a formerly licensed and trained securities professional, Fred Gladle knew, or was reckless or negligent in not knowing, that the HAPS redemption process was fraudulent.

108.    Fred Gladle knew, or was reckless or negligent in not knowing, that, in

the sale or offer of a security or in connection with the sale of a security, he employed a device, scheme, or artifice to defraud; made untrue statements of a material fact or omitted to state material facts necessary to make those statements that were made not misleading, and thereby obtained money or property; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit on investors in connection with the sale of a security.

109.    By knowingly or recklessly providing substantial assistance to Pendley by preparing for Pendley's use in selling Historical Bonds, purchase agreements that contained false information, or omitted material information that made those statements that were made materially misleading, Fred Gladle aided and abetted Pendley's violations of Section 17(a) of the Securities Act.

110.    Barbara Gladle received ill-gotten gains into a bank account held in her name, as stated above, to which she does not have a legitimate claim, and which was subject to use by both Fred Gladle and Barbara Gladle.

### E.    Pendley's Fraudulent Sales of Historical Bonds

111.    During the Relevant Period, Pendley raised at least $2.46 million from at least 55 investors in multiple U.S. states through fraudulent offerings and sales of Historical Bonds from his own inventory for which HAPS served as custodian.

112.    Pendley's principal business activity and sole source of income during the Relevant Period were from his purchase and sale of Historical Bonds.

113.    To sell the Historical Bonds, Pendley cultivated a clientele among his friends and associates. These included members of a golf club located in Burbank, California to which he belonged during the Relevant Period.

114.    Pendley induced investors to purchase the Historical Bonds, which he typically sold for $5,000 each, by making material misstatements or omitting material information which made those statements which were made materially misleading, some of which originated with HAPS and the Abshiers and others of which Pendley devised.

115.    Among the material misrepresentations Pendley made during the Relevant Period to multiple investors were the following:

a.  HAPS had a redemption process in place for the Historical Bonds;

b.  The return per bond would be in the range of $5 million to $15 million;

c.  Internationally known accounting firms specifically named by Pendley were involved in facilitating investor payouts;

d.  Each bondholder would receive $250,000 in Healing Funds within months of the bond purchase; and

e.  The SEC, FBI, and Department of Homeland Security were all aware of the redemption process and would be monitoring clients' accounts.

116.    In addition to the foregoing material misrepresentations communicated to multiple investors, Pendley also made the following material misrepresentations to individual investors:

a.  On June 30, 2019, Pendley told an investor that Pendley had "personally verified bank statements in HAPS' name";

b.  On July 3, 2019, Pendley told an investor that "HAPS has sufficient funds to cover [$250,000 in Healing Funds] for over 30,000 client accounts"; and

c.  On September 20, 2021, Pendley told an investor that, "[t]he State Department has completed its database findings of the 50K HAPS clients and have [sic] cleared the path for deposit distributions."

117.    Pendley also presented at least 41 investors with a bond purchase agreement which falsely represented that "the bond [or bonds] being transferred has legal claim values that are hundreds of times more than the purchase price being paid," without disclosing the existing governments' longstanding refusal to payout on the bonds and adverse decisions in court actions to recover on the bonds.

118.    Of the 41 investors, at least 16 were repeat customers of Pendley's.

119.    As a formerly licensed and trained securities professional, Pendley knew, or was reckless or negligent in not knowing, that the statements he repeated regarding the HAPS redemption process were materially misleading.

120.    Pendley further falsely represented to several investors that he did not retain any proceeds from bond sales and that he transferred all proceeds he received to HAPS.

121.    Other than paying those from whom he purchased Historical Bonds, including the Gladles, Pendley retained the remaining funds and used them on personal expenses such as his golf club membership and his children's college tuition.

122.    Contemporaneous with each bond sale, Pendley typically provided to each investor a HAPS New Member Application and NCNDA and directed the investor to complete both and send them directly to HAPS.  Once approved, this would result in HAPS changing the name of the bondholder on its records from Pendley to the investor and granting the investor access to the Portal.

123.    Pendley knew, or was reckless or negligent in not knowing, that, in the sale or offer of a security or in connection with the sale of a security, he employed a device, scheme, or artifice to defraud; made untrue statements of a material fact or omitted to state material facts necessary to make those statements that were made not misleading, and thereby obtained money or property; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit on investors in connection with the sale of a security.

### F.    Scannell's Fraudulent Sales of Historical Bonds

124.    Scannell primarily sold Historical Bonds to preexisting investors in Sovereign Debt Solutions, which he had formed with Pendley in 2008 as a vehicle for pooling Historical Bonds for liquidation.

125.    Beginning in 2008, Pendley and Scannell, via Sovereign Debt Solutions' general partner Ocean Park Partners, directed SDS' sale of limited partnership

interests in SDS in exchange for Historical Bonds, claiming that they planned to pursue litigation against the successors of German utility companies which issued the bearer bonds and, alternatively, pursue "direct negotiations" with the German government.

126.    By 2013, they had ceased all litigation efforts due to other bondholders' unsuccessful lawsuits.

127.    At that time, Pendley and Scannell touted the HAPS redemption process to the Sovereign Debt Solution's limited partners, and with their knowledge, placed all of SDS' Historical Bonds with HAPS.

128.    Pendley and Scannell thereafter regularly provided summaries of HAPS' misleading Portal updates to the Sovereign Debt Solutions' limited partners.

129.    Additionally, between April 2017 and June 2022, Scannell sold Historical Bonds from his own inventory to at least 29 of the Sovereign Debt Solutions limited partners located in different states, raising at least $374,000.

130.    Scannell made these sales after having plied the Sovereign Debt Solutions' nearly 100 limited partners for years with false information about the HAPS redemption process.

131.    Scannell's principal business activity and primary source of income from April 2017 through June 2022 were his sales of Historical Bonds.

132.    The purchase agreements that Scannell used in his bond sales falsely stated that the bonds "have legal claim values that are hundreds of times more than the purchase price being paid," without disclosing certain red flags that revealed that the HAPS redemption process was fraudulent, including but not limiting to, existing impediments to recovery and continued adverse court decisions.

133.    As a licensed and trained securities professional, Scannell knew, or was reckless or negligent in not knowing, that the HAPS redemption process was fraudulent.

134.    Scannell claimed that he sold Historical Bonds to Sovereign Debt

Solutions' clients so that they could become HAPS clients in their own right and gain direct access to the Portal, rather than rely on his and Pendley's summaries of the updates. Scannell thereby facilitated their direct access to HAPS' lulling statements.

135. Scannell knew, or was reckless or negligent in not knowing, that, in the sale or offer of a security or in connection with the sale of a security, he employed a device, scheme, or artifice to defraud; made untrue statements of a material fact or omitted to state material facts necessary to make those statements that were made not misleading, and thereby obtained money or property; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit on investors in connection with the sale of a security.

## II. Pendley's, Scannell's, Sovereign Debt Solutions', and Ocean Park Partners' Fraudulent and Unregistered Offer and Sale of Promissory Notes and SDS Limited Partnership Interests

136. Beginning in at least April 2017 and continuing to at least May 2022, Pendley and Scannell, in their roles as officers of Sovereign Debt Solutions' general partner, Ocean Park Partners, solicited existing SDS investors to loan SDS monies in exchange for a promissory note and additional limited partnership interests in SDS.

137. The promissory notes provided for repayment of principal with 10% annual interest within six months, subject to indefinite extension at Sovereign Debt Solutions' discretion, or at the latest on the occurrence of a "Liquidity Event."

138. This "Liquidity Event" was variously defined in the promissory notes as the sale of securitization of Sovereign Debt Solutions' Historical Bonds or the obtaining of a settlement or judgment in any litigation against the bonds' issuers.

139. The promissory notes were to be subordinated to a purported $1 million outstanding loan from Ocean Park Partners to Sovereign Debt Solutions.

140. As described above, Pendley and Scannell ceased pursuing litigation as a means to redeeming the Historical Bonds in or about 2013, and the HAPS redemption process did not exist.

141.   Therefore, Pendley and Scannell knew, or were reckless or negligent in not knowing, that there was no realistic expectation of any investor being repaid or receiving interest, given the improbability of a Liquidation Event ever occurring or the resulting proceeds being enough to cover the purported loan from OPP.

142.   At least eight existing Sovereign Debt Solutions' investors in different states entered into 28 promissory notes pursuant to which they paid a cumulative total of $103,500 to SDS and received at least 41 limited partnership interests.

143.   Scannell signed the notes on behalf of Sovereign Debt Solutions in his role as president of Ocean Park Partners, SDS' general partner.

144.   The $103,500 was deposited into a bank account in the name of Sovereign Debt Solutions, from which Pendley and/or Scannell, as officers of Ocean Park Partners, directed the transfer of at least $50,500 to a bank account in OPP's name to pay business expenses.

145.   No registration statement was filed with the Commission as to the offer or sale of the promissory notes or the limited partnership interests, and neither Pendley nor Scannell made any effort to determine whether any investor was an accredited investor as defined by Rule 501 of Regulation D [17 C.F.R §230.501].

146.   The promissory notes and the limited partnership interests are securities.

147.   No exemption to the registration requirements applies to the issuance of the promissory notes or the limited partnership interests.

148.   Sovereign Debt Solutions has not repaid the principal nor any interest on the promissory notes.

149.   Pendley and Scannell each knew, or was reckless or negligent in not knowing, that, in the sale or offer of a security or in connection with the sale of a security, he employed a device, scheme, or artifice to defraud; made untrue statements of a material fact or omitted to state material facts necessary to make those statements that were made not misleading, and thereby obtained money or property; and engaged in acts, practices, or courses of business which operated or would

operate as a fraud or deceit on investors in connection with the sale of a security.

150.    Pendley's and Scannell's scienter is imputable to Ocean Park Partners, whose scienter is imputable to Sovereign Debt Solutions.

**III.    Fred Gladle and Pendley Acted as Unregistered Dealers**

151.    Fred Gladle and Pendley each engaged in the regular business of buying and selling securities for his own account.

152.    On his current LinkedIn page, Fred Gladle identifies himself as having spent approximately twenty years working with buyers and sellers of Historical Bonds

153.    Tax return records further show that his principal source of income was from the profits he made from the purchase and sale of Historical Bonds.

154.    In or around late 2016, Fred Gladle placed his inventory of Historical Bonds in the custody of HAPS.

155.    As detailed above, during the Relevant Period, Fred Gladle sold Historical Bonds to Pendley, whom Gladle knew was going to resell the Historical Bonds to retail customers, and to a retail customer introduced to him by Pendley.

156.    Like Fred Gladle, Pendley also developed a business of buying and selling Historical Bonds.

157.    In November 2023, Pendley gave sworn testimony that proceeds from the purchase and sale of Historical Bonds had been his sole source of income the prior five years.

158.    Pendley purchased Historical Bonds from Fred Gladle and third parties, using HAPS' custodial services.

159.    As detailed above, during the Relevant Period, Pendley sold Historical Bonds to at least 55 investors.

160.    Post-sale, both Pendley and Fred Gladle fielded investor inquiries.  For example, Pendley fielded inquiries as to when investors could expect to receive "Healing Funds" and redemption proceeds.  Fred Gladle assisted clients with gaining

access to the HAPS portal.

161.    During the Relevant Period, neither Fred Gladle nor Pendley was registered with the Commission as a dealer, nor associated with any registered broker-dealer.  Neither was eligible for an exemption from registration.

162.    Therefore, Fred Gladle and Pendley acted as unregistered dealers.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act

### (Against Defendants Fred Gladle, Pendley, Scannell, Sovereign Debt Solutions, and Ocean Park Partners)

163.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 150.

164.    By engaging in the conduct described above, Defendants Fred Gladle, Pendley, Scannell, Sovereign Debt Solutions, and Ocean Park Partners, directly or indirectly, singly or in concert, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails: (a) knowingly or recklessly have employed one or more devices, schemes, or artifices to defraud; (b) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of material fact, or omissions of a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchaser.

165.    By reason of the foregoing, Defendants Fred Gladle, Pendley, Scannell, Sovereign Debt Solutions, and Ocean Park Partners, violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange and Rule 10b-5

### (Against All Defendants)

166.   The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 150.

167.   By engaging in the conduct described above, the Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities, and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have: (a) employed one or more devices, schemes, or artifices to defraud; (b) made one or more untrue statements of material fact, or omitted to state one or more material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in one or more acts, practices, or courses of business that operated or would operate as a fraud and deceit upon other persons.

168.   By reason of the foregoing, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

### Violations of Sections 5(a) and (c) of the Securities Act

### (Against Defendants Pendley, Scannell,

### Sovereign Debt Solutions, and Ocean Park Partners)

169.   The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 42, 45 through 48, and 124 through 150.

170.   By engaging in the conduct described above, Defendants Pendley, Scannell, Sovereign Debt Solutions, and Ocean Park Partners, without a registration statement in effect as to the offer and sale of the promissory notes and limited partnership interests referenced in paragraphs 136 through 150 above: (a) made use of

the means and instruments of transportation or communications in interstate commerce or of the mails to sell securities through the use of medium of any prospectus or otherwise; (b) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; and (c) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement was filed.

171.   By reason of the foregoing, Pendley, Scannell, Sovereign Debt Solutions, and Ocean Park Partners violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) & 77e(c)].

**FOURTH CLAIM FOR RELIEF**

**Aiding and Abetting Violations of Securities Act Section 17(a)**

**(Against Defendant Fred Gladle)**

172.   The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 109.

173.   Defendant Pendley, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (a) knowingly or recklessly had employed one or more devices, schemes, or artifices to defraud; (b) knowingly, recklessly, or negligently had obtained money or property by means of one or more untrue statements of material fact, or omissions of a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) knowingly, recklessly, or negligently had engaged in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchaser.

174.   Defendant Gladle knowingly or recklessly provided substantial assistance to Defendant Pendley with respect to his violations of Section 17(a) of the

Securities Act by, among other things, knowingly or recklessly preparing purchase agreements with false information that Pendley used to sell Historical Bonds.

175.    By engaging in the conduct described above, Defendant Gladle aided and abetted Pendley's violations of Section 17(a) of the Exchange Act [15 U.S.C. § 78q(a)].

## FIFTH CLAIM FOR RELIEF

### Violations of Section 15(a)(1) of the Exchange Act

### (Against Defendants Fred Gladle and Pendley)

176.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 42, 45 through 48, 59, 61, 89 through 106, 111 through 114, 117, 118, 121, 122, and 151 through 162.

177.    By engaging in the conduct described above, Defendants Fred Gladle and Pendley, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce effected transactions in, or induced or attempted to induce the purchase or sale of securities, while they were not registered with the Commission as a broker or dealer or when they were not associated with an entity registered with the Commission as a broker-dealer.

178.    By engaging in the conduct described above, Fred Gladle and Pendley violated and, unless enjoined, will continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## SIXTH CLAIM FOR RELIEF

### Violations of Rule 21F-17(a) of the Exchange Act

### (Against Defendants C.W. Abshier and HAPS)

179.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 88.

180.    By engaging in the conduct described above, Defendants C.W. Abshier and HAPS, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, took action to impede an individual from

communicating directly with the Commission staff about a possible federal securities law violation, or threatening to enforce a confidentiality agreement with respect to such communications.

181.   By engaging in the conduct described above, C.W. Abshier and HAPS violated and, unless enjoined, will continue to violate Rule 21F-17(a) under the Exchange [17 C.F.R. § 240.21F-17(a)].

## SEVENTH CLAIM FOR RELIEF

### Unjust Enrichment

### (Against Relief Defendant Barbara Gladle)

182.   The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 110.

183.   Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)] states: "In any action or proceeding brought or instituted by the SEC under any provision of the securities laws, the SEC may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

184.   As alleged in paragraphs 19, 93, 104, and 110, Relief Defendant Barbara Gladle received the proceeds of unlawful activity to which she has no legitimate claim and gave no consideration for exchange of those funds.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoin Defendants Fred Gladle, Pendley, Scannell, Sovereign Debt Solutions, and Ocean Park Partners from directly or indirectly violating Securities Act Section 17(a) [15 U.S.C. § 77q(a) and all Defendants from

directly or indirectly violating Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restrain and enjoin Defendants Pendley, Scannell, Sovereign Debt Solutions, and Ocean Park Partners from directly or indirectly violating Securities Act Sections 5(a) and (c) [15 U.S.C. §§ 77e(a) and 77e(c)].

### IV.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restrain and enjoin Defendants Fred Gladle and Pendley from directly or indirectly violating Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)(1)].

### V.

Issue Judgements, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restrain and enjoin Defendants C.W. Abshier and HAPS from directly or indirectly violating Exchange Act Rule 21F-17(a) [17 C.F.R. § 240.21F-17(a)].

### VI.

Permanently restrain and enjoin Defendants Fred Gladle, Pendley, Scannell, C.W. Abshier, and Billy Abshier from directly or indirectly, including, but not limited to, through any entity owned or controlled by each, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent each from purchasing or selling securities listed on a national securities exchange for his own personal account.

### VII.

Order Defendant Fred Gladle and Relief Defendant Barbara Gladle, on a joint and several basis, and Defendants Pendley and Scannell to disgorge the ill-gotten gains received because of the violations alleged in this Complaint, including

prejudgment interest, pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

### VIII.

Order Defendants Fred Gladle, Pendley, and Scannell to pay civil penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and order C.W. Abshier and Billy Abshier to pay civil penalties pursuant to Exchange Act Section 21(d)(3).

### IX.

Order that Defendants Fred Gladle, C.W. Abshier, Pendley, and Scannell be permanently prohibited from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)].

### X.

Granting such other and further relief as the Court determines to be necessary and appropriate.

Dated:  December 13, 2024

/s/ Douglas M. Miller
_____
Douglas M. Miller
Oren Gleich (*pro hac vice pending*)
Attorneys for Plaintiff
Securities and Exchange Commission